[Civ. No. 2977. Third Appellate District.—October 27, 1925.]

P. H. BOTTOMS et al., Appellants, v. MADERA IRRI-GATION DISTRICT, Respondent; MILLER & LUX, INC., Intervener and Respondent.

[1] Irrigation Districts — Public Agencies — Powers. — Irrigation districts are public corporations or agencies, and such an agency has only such powers as are given to it by the act of the legislature under and by virtue of which it exists, either as are expressly stated or such as are necessarily implied in order to carry out the purposes of the district.

[2] Id.—Powers of Board of Directors—Disposition of Property. While the board of directors of an irrigation district, in the performance of its duties, has the power to construct, acquire, or purchase water rights, canals, ditches, dams, etc., the property so acquired is the property of the district, and the board of directors possesses no power to dispose of any of the property of the district other than in the manner provided by law.

[3] Id.—Powers of Officers—Mode of Exercise—Void Contracts. Anyone dealing with a public corporation, a state agency, or what has been sometimes called an "executive arm of the state," is chargeable with knowledge of all the powers that the officers of such corporation, or state agency, possess, or may legally exercise, and all contracts, or purported contracts, which may be entered into, which go beyond the scope of the power vested in the officer exercising the functions of said agency are void; and knowledge must be taken not only of the extent of the power, but also the mode in which such power may be exercised.

[4] Id.—Employment of "Mediators"—Unauthorized Expenditures. Section 30 of the Irrigation District Act, relating to the duty of

1. See 26 Cal. Jur. 348; 15 R. C. L. 495.
2. See 26 Cal. Jur. 409.
3. See 18 Cal. Jur. 798, 1003; 26 Cal. Jur. 403.
4. See 18 Cal. Jur. 405.

the board of directors of an irrigation district to estimate and determine the amount of money necessary to be raised for the purposes set forth in said section, does not authorize the expenditure of money raised from the sale of bonds toward the payment of claims of "mediators" appointed to settle and adjust the adverse claims of riparian owners and prior appropriators.

[5] ID.—ISSUANCE OF BONDS—AUTHORIZED EXPENDITURES.—In ascertaining the meaning of the words "and otherwise carrying out the provisions of this act," contained in section 30 of the Irrigation District Act, these words should be read as though the words "or any other act," which immediately follow, were not found in the section, and, when so used, said words mean that for the purposes of construction or purchasing necessary irrigation canals, etc., bonds may be issued for acquiring property necessary for the purposes of the district and otherwise carrying out the provisions of the act, under which the district was authorized to acquire property or construct works and also under the provisions of any other act covering the same power, and are not to be read as granting unlimited power in the expenditure of money derived from the sale of bonds.

[6] ID.—UNAUTHORIZED DIVISION OF BOND MONEY.—Under the irrigation District Act, when bonds are issued for construction purposes, the acquisition of water rights, the building of canals, dams, reservoirs, etc., the money so raised must be devoted to such purposes and cannot be diverted at either the pleasure or desire of any board of directors.

[7] ID. — GRANT OF POWERS — MODE OF EXERCISE — STATUTORY CONSTRUCTION.—While the grant of powers contained in section 15 of the Irrigation District Act is general and comprehensive in terms, it is not absolute and independent of other sections of the act, but is relative only and must be exercised in accordance with the limitations, and restrictions defining the mode of the exercise of the granted powers, as found in sections 30, 30a, 37, 39, 55, 59, and 61, of said act.

[8] ID.—EMPLOYMENT OF "MEDIATORS" — FAILURE TO PROVIDE FUNDS —INVALID CONTRACT.—Where a "conciliation committee," appointed pursuant to a resolution of the board of directors of an irrigation district enter into a contract purporting to employ certain "mediators" to settle and adjust the adverse claims of riparian owners and prior appropriators, and the provisions of the Irrigation District Act relative to the raising of money and limiting the liabilities which may be incurred upon the district by the board of

5.   See 26 Cal. Jur. 404.
6.   See 26 Cal. Jur. 406.
8.   See 26 Cal. Jur. 405.

directors are not complied with, or in any manner attempted to be complied with, either prior or subsequent to the making of the contract, said contract is invalid, and recovery by said "mediators" cannot be had thereunder.

[9] ID.—POWERS OF BOARD OF DIRECTORS—DISPOSITION OF PROPERTY—DISSOLUTION OF DISTRICT.—The board of directors of an irrigation district are only empowered to execute the various provisions of the Irrigation District Act, for the preservation of the district, for the protection of its properties, and for the distribution of water to the irrigable lands within the boundaries of the district, and there is nothing in the Irrigation District Act which empowers a board of directors to contract to dispose of its properties, to provide for the dissolution of the district, and the conveyance of its rights and privileges to some other corporation.

[10] ID.—VOLUNTARY DISSOLUTION—SALE OF UNNECESSARY PROPERTY. Voluntary dissolution of an irrigation district can only be had in accordance with the provisions of the Irrigation District Act, as amended in 1915 (Stats. 1915, p. 859); and while there is a section in the act empowering a board of directors under certain circumstances to sell property unnecessary for the uses and purposes of the district, there is nothing in any of the sections which contemplates the entering into a contract for the dissolution and death of the district.

[11] ID.—ULTRA VIRES CONTRACT—WISDOM OF AGREEMENT—ABSENCE OF MORAL WRONG.—The wisdom of an agreement entered into between "mediators" for an irrigation district and a riparian owner who is asserting claims adverse to the district has nothing to do with its *ultra vires* character; and if the agreement is not one authorized by the Irrigation District Act, it is illegal, even though there is no taint or color of moral wrong.

[12] ID. — POWERS OF BOARD OF DIRECTORS — ABDICATION TO OTHER CORPORATIONS.—Boards of directors have only such powers as are expressly granted or necessarily included in the exercise of the powers granted, and they cannot abdicate their powers and turn over the properties to other corporations.

[13] ID.—FAILURE TO FULLY PERFORM SERVICES—ULTRA VIRES CONTRACT—QUANTUM MERUIT.—Where "mediators" are employed under an *ultra vires* contract to effect a composition or settlement of the differences between an irrigation district and an adverse claimant of certain water rights, and the agreement procured by said "mediators" does not settle any of the pending suits of said adverse claimant, and no pending litigation is terminated, but said agreement at best is only a proposed method by which

10.   See 26 Cal. Jur. 408.
11.   See 26 Cal. Jur. 403.

a composition or settlement may be had, said "mediators" are not entitled to recover on *quantum meruit.*

[14] Id.—Action to Recover Compensation—Intervention Without Prejudice.—In this action by certain "mediators" for an irrigation district to recover compensation for services rendered in connection with the procuring of an agreement with an adverse claimant of water rights, who was also a large property owner within the district, as plaintiffs were not entitled to recover either under their contract of employment or on *quantum meruit*, any error of the trial court in permitting said adverse claimant and property owner to intervene in the action did not result in a miscarriage of justice, or constitute grounds for reversal.

---

(1) 40 Cyc., p. 817, n. 83, p. 821, n. 23 New.   (2) 40 Cyc., p. 821, n. 18 New.   (3) 36 Cyc., p. 873, n. 1, 7.   (4) 40 Cyc., p. 821, n. 18 New, 24.   (5) 10 C. J., p. 1243, n. 31; 40 Cyc., p. 821, n. 24.   (6) 40 Cyc., p. 822, n. 33.   (7) 40 Cyc., p. 821, n. 18 New.   (8) 40 Cyc., p. 821, n. 18 New.   (9) 40 Cyc., p. 821, n. 18 New.   (10) 40 Cyc., p. 825, n. 60 New.   (11) 40 Cyc., p. 821, n. 18 New.   (12) 40 Cyc., p. 821, n. 18 New.   (13) 40 Cyc., p. 821, n. 18 New.   (14) 4 C. J., p. 665, n. 14, p. 1168, n. 98.

APPEAL from a judgment of the Superior Court of Madera County. Eugene P. McDaniel, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Lindsay & Conley, C. E. Lindsay, W. M. Conley, Philip Conley and Matthew Conley for Appellants.

Haven, Athearn, Chandler & Farmer for Respondent.

T. P. Wittschen, J. E. Woolley and Joseph C. Sharp for Intervener and Respondent.

PLUMMER, J.—Action to recover the sum of $176,000 alleged to be due the plaintiffs from the defendant for services rendered by the plaintiff for the uses and purposes of the defendant. The defendant had judgment and the plaintiffs appeal.

The record shows the existence of the Madera Irrigation District organized and existing under and by virtue of the act commonly referred to as the Wright-Bridgford Act (Stats. 1897, p. 254), and the acts amendatory thereof and

supplemental thereto; that prior to the tenth day of July, 1922, the qualified voters of the Madera Irrigation District had voted bonds in the sum of $28,000,000 for the purpose of effectuating and carrying out the plans of said Irrigation District to appropriate, impound, store, and distribute the waters of the San Joaquin River upon the lands situate within the boundaries of said District for the purpose of irrigation. It also appears from the record that during all of the times mentioned in this proceeding, the intervener, Miller & Lux, Incorporated, was a corporation owning a large tract of land lying within the exterior boundaries of said Madera Irrigation District; that between said Madera Irrigation District and Miller & Lux, Incorporated, much litigation was pending (some twenty-nine actions in all). The complaint alleges that this pending litigation seriously impaired, retarded and threatened to subvert the purposes for which the District had been formed and that the initiation of additional actions against the District were threatened by the said Miller & Lux, Incorporated.

It further appears that on or about the eighth day of July, 1922, the board of directors of the Madera Irrigation District, having in view the litigation to which we have referred, adopted the following resolution:

"Whereas, this board of directors of Madera Irrigation District has heretofore placed itself on record as favorable to any fair and equitable composition and settlement of any adverse claims of riparian owners and appropriators on the San Joaquin River, and

"Whereas, it appears that it is necessary and advisable to constitute a particular authority for initiating and for receiving such proposals of settlement and composition,

"Now Therefore, be it resolved that there be and there is hereby created a committee to be known as the 'Conciliation and Settlement Committee.' That said Committee shall have four members and shall consist of the President of the Board, the General Manager of the District and two members of the Board of Directors to be appointed by the President.

"That said Committee continue in existence during the pleasure of the Board.

"That the duties of said committee be to enter into negotiations and endeavor to compromise the differences now existing between Madera Irrigation District and any other parties having or asserting any riparian or appropriation or other claims adverse to the right of the Madera Irrigation District to divert and store waters of the San Joaquin River and its tributaries. And to do all things that may seem, in the judgment of the committee necessary or proper in the premises, provided, however, that said committee shall in no way do or agree to do anything that may delay, impair or abate any legal proceedings now under way or that hereafter may be ·instituted, and provided further, that the committee, before agreeing finally to any proposition of settlement, must have the approval of the Board of Directors thereto.

"That said committee be authorized to call the Board in session as a committee of the whole at any reasonable time or place whenever any of the negotiations shall reach the point requiring any further approval of this Board.

"And that the said committee shall have authority in their discretion, and on such terms as they may deem proper, arrange to employ any person or persons as mediators in effecting or negotiating any settlement; and may call upon the legal and engineering departments or any other department of the District for any matter required by them."

That thereafter, and on or about the tenth day of July, 1922, the committee referred to in the resolution adopted by the board of directors of the Madera Irrigation District entered into a contract with the plaintiffs purporting to employ the said plaintiffs to negotiate a settlement and composition of all matters of controversy between the Madera Irrigation District and Miller & Lux, Incorporated. This memoranda of agreement reads as follows:

"This Memorandum of Agreement, made this tenth day of July, 1922, at Madera, California, by and between P. H. Bottoms and Tom F. Saunders, of Fresno, California, hereinafter referred to as 'Mediators,' and J. W. Schmitz, N. E. Sanders, J. L. Davis and Walter C. Maloy, the Conciliation and Settlement Committee of Madera Irrigation District, a public corporation, thereunto authorized by Reso-

lution No. 457 of the Board of Directors of said District, hereinafter referred to as the 'Committee.'

"Witnesseth:

"That the Committee, on behalf of Madera Irrigation District, do employ the Mediators to negotiate a settlement and composition, satisfactory to the Committee and to the Board of Directors of Madera Irrigation District of all conflicting claims and rights and all pending litigation and controversies now existing, or that may arise prior to a settlement, between Miller & Lux, Inc., and its subsidiary corporation, as parties on one side, and Madera Irrigation District as the party on the other side and the Committee by the authority above set forth agrees that Madera Irrigation District will pay to the Mediators on the negotiation of such a settlement on the conditions and in the time, place and manner hereinafter set forth the compensation hereinafter mentioned.

"And the Mediators agree to undertake to negotiate a settlement and composition, satisfactory to the Committee and to the Board of Directors of Madera Irrigation District, of all conflicting claims and rights and all pending litigation and controversies now existing or that may arise prior to settlement between Miller & Lux Inc. and its subsidiary corporations as parties on one side and Madera Irrigation District as party on the other side, and said Mediators agree, to receive and accept as full compensation for their services and expenses the compensation hereinafter mentioned.

"And it is agreed between the Committee and the Mediators that within thirty days after the conclusion of a settlement and composition of said claims, rights, litigation and controversies between said parties and after the approval of the same by the California Bond Certification Commission, the Madera Irrigation District will pay to the said Mediators in consideration of the negotiation of such settlement and composition and in full payment for their services and expenses and of all fees and sums by them paid or agreed to be paid to any attorneys, engineers or other persons, a fee to be determined as follows: That is to say Fifty (50¢) Cents for each acre of land in Madera Irrigation District under the terms of such settlement,

said fee being payable in cash in lawful money of the United States.

"The parties hereto further agree as material conditions and considerations hereof:

"That such settlement shall be negotiated within six months from date hereof, unless such time shall be further extended by the Committee.

"That the Mediators shall communicate all proposals for settlement to the Committee and that the same shall not be otherwise communicated to the Madera Irrigation District until the same shall be approved by the Committee.

"That in case a settlement shall not be negotiated within six months from date hereof satisfactory to the Committee and to the Board of Directors of Madera Irrigation District nothing shall be due or payable to the Mediators hereunder, and the said District shall not be liable in any case for any fees or other compensation agreed by the Mediators to be paid to any attorneys, engineers or other persons, nor for any expenses of the Mediators."

While the plaintiffs count upon an area of 353,000 acres as the basis of computing the value of their services, the trial court found that the contemplated water district would include only 284,000 acres and was the ultimate acreage within the contemplation of the parties when entering into the agreement dated July 10, 1922. Thereafter, and on or about the thirtieth day of July, 1922, the board of directors of said Irrigation District passed a resolution purporting to ratify and approve the execution of the foregoing agreement, and the following day, to wit, the thirty-first day of July, 1922, the agreement purporting to settle and compose the differences between the Madera Irrigation District and Miller & Lux, Incorporated, and procured by the plaintiffs, was signed by the defendant Madera Irrigation District and the intervener, Miller & Lux, Incorporated. This instrument is worded as follows:

"In order to compose all of the differences existing between Miller & Lux, Incorporated, the proposed West Side Water Storage District and the Madera Irrigation District, the following course of procedure is hereby agreed upon:

"1. A water storage district shall be formed, including all of the territory included in the proposed West Side Water Storage District and the territory petitioned to be

included therein, and such parts of the Madera Irrigation District, Webster Irrigation District and Medano Irrigation District situated south of the Chowchilla River as are found to be susceptible of economical irrigation in view of their character and available water supply. The boundaries of the proposed district shall be immediately determined by two engineers, one selected by Miller & Lux, Incorporated, and one by the Madera Irrigation District, who shall co-operate with the State Engineer, or his representatives, so as to fix the boundaries of the said district in such manner as will meet with the approval of the State Engineer. The said work shall be completed within thirty (30) days from the date hereof. The said District shall be known as the San Joaquin River Water Storage District.

"2. The parties hereto shall immediately co-operate through their respective engineers, in making such investigations as to water supply of the San Joaquin River, Fresno River and Chowchilla River, of dam sites and reservoirs and land susceptible of economical irrigation as shall be necessary in order to prepare a petition for the formation of said district, to establish the boundaries thereof, the sources of water supply, and the location of dam sites and reservoirs, and in order to determine whether the said Fresno River and Chowchilla River shall be developed by said water storage district as well as the said San Joaquin River and be made a part of the general project.

"3. Immediately upon fixing the boundaries of the said district, the parties hereto shall jointly prepare a petition for the formation of said water storage district, circulate the same for signatures and present the same to the State Engineer for approval and take all other actions and steps necessary for the approval of said petition and the formation of said district.

"4. An agreement shall be entered into between Miller & Lux Incorporated and other land owners in said water storage district so to be formed providing that the Board of Directors of such district shall consist of nine directors, four of whom shall be selected by Miller & Lux Incorporated, four by the other land owners in said District and one by the eight directors thus selected. Such agreement

shall be of the same general tenor as the agreement heretofore entered into between Miller & Lux Incorporated and the other land owners on the west side of the San Joaquin River. The district shall be divided into nine divisions, four of which shall be situated on the west side of the San Joaquin River, four on the east side of the San Joaquin River, and one partly on the east side and partly on the west side and two of the directors selected by Miller & Lux Incorporated shall represent divisions on the west side and two divisions on the east side and two of directors selected by the other land owners shall represent divisions on the west side and two divisions on the east side and the ninth director shall represent the division situated partly on the east side and partly on the west side. During the period of three (3) years from date hereof, unless said Madera Irrigation District shall be sooner dissolved, the Board of Directors of said District may secure, hold and exercise the proxies and powers of attorneys of the land owners of said Water Storage District, situate within the area thereof now embraced within said Madera Irrigation District, or any portion thereof, authorizing said Board of Directors, on behalf of said land owners, to cast the ballots or votes of said land owners on any matter submitted to the voters of said proposed Water Storage District, or at any election of officers thereof.

"5. Pending the formation of said district all actions and proceedings and all litigation pending between the parties hereto shall stand in abeyance and no proceedings shall be had or taken therein by either party, except such proceedings as are necessary to preserve during said time the rights of the parties therein. It is the intention that no additional liability shall be imposed upon Miller & Lux Incorporated with respect to the assessments now involved in litigation during said period, and no penalty for nonpayment thereof accruing during said period, and after the date hereof, shall be collected. But if the action involving said assessments should become final by the denial of the pending petition for re-hearing and for a writ of error or otherwise during said period, the said Miller & Lux Incorporated agrees to forthwith pay said assessments.

"6. Pending the formation of said district, no further expenditures shall be incurred by the Madera Irrigation

District in connection with its dam site or in connection with construction, engineering, litigation, or the acquisition of property or property rights, except by agreement between the directors of the Madera Irrigation District and Miller & Lux Incorporated, and after the formation of said water storage district, all such expenditures shall be made by said water storage district, but nothing herein contained shall prevent the said Madera Irrigation District from carrying out any outstanding contracts or from paying its necessary expenses of administration, including such legal and engineering expense as may be necessary in carrying out the provisions of this agreement or in preserv-ing during said time the rights of the parties in pending litigation. The contract made by said district for making borings at its dam site shall be modified so that said work shall be done jointly by the parties hereto.

"7. Upon the formation of said district, the present petition now before the State Engineer for the formation of the said West Side Water Storage District shall be withdrawn and dismissed and all other litigation, cases and proceedings now pending between the parties hereto shall likewise be dismissed without prejudice to either party and without costs for or against either party and proceedings shall at once be taken for the dissolution of the said Madera Irrigation District and the Reclamation Districts heretofore formed in said territory by Miller & Lux Incorporated and the turning over to said water district of all property and property rights of Madera Irrigation District and the assumption by the said water storage district of all indebtedness of the said Madera Irrigation District and said Reclamation Districts and all expenses of Miller & Lux Incorporated in litigation with said Madera Irrigation District and all expenses incident to the formation of said West Side Water Storage District, and all expenses of the parties hereto in carrying out this agreement. All the indebtedness of and expense incurred by said Madera Irrigation District and so assumed shall be assessed to the portion of the territory included in the said proposed water storage district now included in said Madera Irrigation District and all the expenses of the said West Side Water Storage District and said Miller & Lux Incorporated and said reclamation districts thus assumed shall

be assessed on the balance of the territory in said proposed water storage district. The petition for the dissolution of the said Madera Irrigation District shall be circulated and signed at the same time as the petition for the formation of said Water Storage District, but said petition shall not be filed with the Board of Directors until and when said Water Storage District has been formed and there has been formed and there has been turned over to said district the water rights, as hereinafter provided, and plans and specifications for the irrigation and drainage of lands within said District have been duly approved and adopted by said Board of Directors, and the voters of said District shall have, pursuant to the provisions of said California. Water Storage District Act, voted that said project shall be completed, and said Petition shall state said conditions as to filing thereof.

"8. Upon the formation of said Water Storage District, the said Miller & Lux Incorporated shall convey to the said District all of its water rights and all water rights of its subsidiaries in the San Joaquin and Fresno Rivers, and all canals and other works connected therewith. It is intended hereby that said water rights shall be so turned over that the lands now irrigated, or entitled to be irrigated, by the canals of the San Joaquin & Kings River Canal & Irrigation Company Incorporated, and other existing canals, shall continue to have a prior right to irrigation therefrom from the gravity flow of said streams, but sharing with other lands in the district in any water stored, pumped or acquired by said District. Said Miller & Lux Incorporated, as a riparian owner, in turning over said rights, shall also consent to the diversion and storage by said Water Storage District of all water of the San Joaquin River and the Fresno River necessary for the irrigation of the land within said water storage district, in excess of the amount needed for the irrigation of riparian lands of Miller & Lux Incorporated, now irrigated, or entitled to irrigation therefrom. The question as to the quantity of water reasonably needed for the irrigation of the lands of Miller & Lux Incorporated already irrigated, or entitled to be irrigated, is hereby delegated to the Board of Directors of said Water Storage District and may be determined by said Board. The valuation at which such

rights shall be so turned over to said water storage district shall be agreed upon between the Directors of said water storage district and the owners of such rights. In the event that the said parties cannot agree upon such valuation, the parties hereto agree that the value of such rights may be established by condemnation proceedings.

"9. The parties hereto pledge themselves to carry out the provisions of this agreement and to form the said district and proceed with the said irrigation project with all reasonable speed and with due diligence until completed. Unless the said water storage district is formed and work commenced by it on said irrigation project within one year from the date hereof or within such further time as may be agreed upon by the parties, this agreement shall terminate and all parties shall be restored to their present position."

Upon the transaction herein referred to becoming public, the then board of directors of the Madera Irrigation District were compelled to resign and another board of directors was elected. The record shows that the new board of directors is pursuing a procedure in the settlement of the difficulties facing the District similar to that pointed out in the memorandum signed by the defendant and intervener of date of July 31, 1922. Plaintiffs claiming under the writing hereinbefore set forth that their services had been fully performed, presented their bill in the sum of $176,000 and payment being refused, this action was instituted. Payment is resisted on three grounds: 1. That no composition or settlement of differences between the District and Miller & Lux, Incorporated, has been effectuated; 2. That the board of directors of the Madera Irrigation District had no authority to enter into the contract first set out herein by reason of the fact that there was no money in the treasury of the District applicable to the payment of the plaintiffs' fee for any services they might perform; 3. That the agreement alleged to have been procured by the services of the plaintiffs between the Madera Irrigation District and Miller & Lux, Incorporated, was *ultra vires* and void, and, therefore, could not constitute the basis for any legal claim against the defendant District. The intervener also sets forth the further defense that the employment agreement was kept secret and infor-

mation thereof withheld from the intervener, with the knowledge and consent of the plaintiffs, and consequently void, by reason of the trust relation which the board of directors of the District hold to all land owners, and that the lands of the intervener were being charged with several thousand dollars as the intervener's *pro rata* share of the $0.50 an acre agreed to be paid the plaintiffs in violation of the trust relation existing between the board of directors of the District and the intervener. In other words, that the lands belonging to the intervener situate within the District were to be taxed to pay the fee claimed by the plaintiffs for their services, as employees of the District, in settling differences between the trustee and the *cestui que trust.*

The trial court found that no fraud had been committed upon the intervener, and rested its decision upon the *ultra vires* character of the proceedings which we have outlined. It was also found by the court that a considerable period of time prior to the occurrences here narrated, the district had sold $200,000 worth of bonds of said District, but had expended the proceeds thereof in pursuance of the purposes for which the District was created; that these bonds were certified as provided by the Bond Certification Act, as amended in 1921. The court further found that no money had been provided by levy of assessment, or otherwise, as specified in section 59 of the California Irrigation District Act, except the sum of $66,689.63, and that all of said money had been provided for by an annual assessment for purposes of the District other than for the payment of plaintiffs' alleged compensation and had been so expended by it prior to the institution of this action. The court further found that the memorandum of agreement executed by the defendant intervener procured by the plaintiffs was *ultra vires,* as claimed by the respondents, and constituted no basis upon which to predicate a valid claim against the District.

[1] In considering these questions we think the following propositions are so firmly established that citation of authority is unnecessary, to wit: That irrigation districts are public corporations or agencies; that such agency has only such powers as are given to it by the act of the legislature under and by virtue of which it exists, either as

are expressly stated or such as are necessarily implied in order to carry out the purposes of the district; [2] That while the board of directors of the district, in the performance of their duties have the power to construct, acquire, or purchase water rights, canals, ditches, dams, etc., the property so acquired is the property of the district and that the board of directors of the district possess no power to dispose of any of the property of the district other than in the manner provided by law; [3] that anyone dealing with a public corporation, a state agency, or what has been sometimes called an "executive arm of the state" is chargeable with knowledge of all the powers that the officers of such corporation, or state agency, possess, or may legally exercise, and that all contracts, or purported contracts, which may be entered into, which go beyond the scope of the power vested in the officer exercising the functions of said agency are void; that knowledge must be taken not only of the extent of the power, but also the mode in which such power may be exercised.

Controverting the contentions of the respondents, the plaintiffs insist that there is in the hands of the District $27,500,000 in authorized but unissued bonds of the District; that the various sections of the Irrigation District Act do not prohibit the incurring of the expense referred to herein without having first made provision for its payment; that the memorandum of agreement between the District and the intervener is not *ultra vires,* but if *ultra vires,* a settlement has been secured and plaintiffs should recover upon a *quantum meruit* count in their complaint. Answering the argument of plaintiffs that the authorized or unissued bonds are available and were at the time of the entering into of the contract of date of July 10, 1922, available for liquidating the demands of the plaintiffs, the respondents call attention to section 3b of the Bond Certification Act, as amended in 1921 (Stats. 1921, p. 1198), which section, after setting forth the manner in which irrigation district bonds may be certified and limiting the manner in which the moneys so raised may be expended and the purpose to which such moneys may be applied, contains the following: "Nor shall any expense of any kind be incurred in excess of money actually provided by levy of assessment or otherwise except as provided in sec-

tion fifty-nine of the California Irrigation District Act."
It is conceded that the certification of the bonds as issued
by the District contains no authorization to apply the pro-
ceeds thereof toward the payment of the plaintiffs' claim.
Basing their argument upon this condition, respondents
insist that the District is inhibited by this section from en-
tering into any contract incurring an obligation or liabil-
ity unless an assessment has first been levied to liquidate
the obligation about to be incurred. The appellant offers
the interpretation that this clause means that no expendi-
ture of money of any kind shall be made from bonds
which have been certified, nor shall bonds of an irrigation
district, if part or all of them have been certified, be used
as collateral security for the performance of any unap-
proved act, or, if the defendants' construction be correct,
then and in that case, in so far as the quoted part of said
section purports to modify or amend the California Irri-
gation District Act, it is unconstitutional and violative of
the provisions of article VI of section 24 of the state con-
stituton. Conceding the wisdom of the limitation upon
the acts of boards of directors of irrigation districts at-
tempted to be fixed by the controverted clause contained
in section 3b of the Bond Certification Act, we are not re-
quired to pass upon its constitutionality for the reasons
hereinafter stated.

Sections 30 and 30a of the Irrigation District Act relating
to the issuance of bonds fix the purposes for which the money
provided from the sale thereof may lawfully be used. Sec-
tion 30 gives the power and defines the purposes, section
30a is procedural in its subdivisions, excepting as to the
latter portion thereof. [4] The authority and the use are
found in the first sentence of section 30 of that act, to wit:

"For the purpose of constructing or purchasing necessary
irrigation canals and works, and acquiring the necessary
property and rights therefor, and for the purpose of ac-
quiring waters, water rights, reservoirs, reservoir sites, and
other property necessary for the purposes of said district,
and otherwise carrying out the provisions of this act, or
any other act, under which said district is or may be au-
thorized to acquire property or construct works, the board
of directors of any such district must, as soon after such
district has been organized as may be practicable, and also

whenever thereafter the board of directors shall find that the construction fund raised by the last previous bond issue is insufficient, or that the construction fund has been exhausted by expenditures herein authorized therefrom and it is necessary to raise additional money for said purposes, estimate and determine the amount of money necessary to be raised."

There is nothing in this section which authorizes the expenditure of money raised from the sale of bonds toward the payment of claims such as we are considering in this case. [5] We think that, in ascertaining the meaning of the words "and otherwise carrying out the provisions of this act," contained in said section, these words should be read as though the following words "or any other act" were not found in the section and that these words mean that for the purposes of construction or purchasing necessary irrigation canals, etc., bonds may be issued for acquiring property necessary for the purposes of the district and otherwise carrying out the provisions of this act, under which said district may be authorized to acquire property or construct works and also under the provisions of any other act covering the same power. In other words, the quoted language and "otherwise carrying out the purposes of this act," as found in said section, relate to cognate subjects and are not to be read as granting unlimited power in the expenditure of money derived from the sale of bonds, simply because of the punctuation or lack of punctuation found in said section. Properly construed, the words give the power of carrying out and expending all moneys derived from the sale of bonds in any construction work authorized by the act in which the words are found, or any other act authorizing the district to acquire property, construct works, etc. [6] It is thus apparent that when bonds are issued for construction purposes, the acquisition of water rights, the building of canals, dams, reservoirs, etc., that the money so raised must be devoted to such purposes and cannot be diverted at either the pleasure or desire of any board of directors. It is thus apparent that irrespective of whether the respondents' or the appellants' contention relative to the true interpretation and meaning of the controverted words in section 3b of the Board of Certification Act is correct, the Madera Irrigation District on the

tenth day of July, 1922, had no bond money nor unissued bonds available for payment of the plaintiffs' demand. If the memorandum of agreement entered into between the District and Miller & Lux, Incorporated, can be construed as a purchase or acquisition of water or water rights, and therefore within the permissive portion of section 30 as to the purpose for which bond moneys may be expended, it nevertheless remains true that compensation of employees, agents and officers is an entirely different subject and must be provided for in accordance with the powers granted in other sections of the Irrigation Act, the only exception made in the expenditure of bond money other than for the construction of works, or the acquisition of property, is that for a limited period of time interest on bonds issued for such purposes may be paid out of the proceeds of bonds subsequently issued. Compensation of agents for the settlement of controversies, even though that settlement contemplates the acquisition of property, is not in any sense of the word "purchase money."

[7] These considerations bring us to the question, Was the board of directors of· the Madera Irrigation District on the tenth day of July, 1922, empowered to enter into the contract with the plaintiffs sued upon in this action? Appellants base their contention in this particular principally upon the provisions of section 15 of the Irrigation Act, which section, with other grants of power, contains the following: "Said board shall also have the right to acquire, by purchase, lease, contract, condemnation, or other legal means, all lands, and waters, and water rights, and other property necessary for the construction, use, supply, maintenance, repair and improvements of said canal, canals, etc.," and, also, "The board of directors shall have the power and it shall be their duty to manage and conduct the business and affairs ·of the district; make and execute all necessary contracts; employ and appoint such agents, officers, and employees as may be required, and prescribe their duties."

While the grant of powers contained in this section is general and comprehensive in terms, the grant is not absolute and independent of other sections of the same act. The grant of power is relative only and must be exercised in accordance with the limitations and restrictions defining

the mode of the exercise of the granted powers. The mode, the time and the manner of executing the powers granted by section 15 are found in sections 30, 30a, 37, 39, 55, 59, and 61 of the Irrigation Act. If the limitations contained in the various sections, to which we have just referred, are disregarded, then the exercise of the power granted in section 15 cannot be said to be in accordance with law. In section 61 we find:

"The board of directors or other officers of the district shall have no power to incur any debt or liability whatever, either by issuing bonds or otherwise, in excess of the express provisions of this act; and any debt or liability incurred in excess of such express provisions shall be and remain absolutely void, except that for the purposes of organization, or for any of the purposes of this act, the board of directors may, before the levying of the first assessment, incur indebtedness in such sum or sums as shall amount to two thousand dollars, or, if the district shall contain more than four thousand acres, to one-half as many dollars as there are acres of land in the district, and may cause warrants of the district to be issued therefor, . . . "

The different provisions of the act referred to by the language contained in section 61 fix the time and define the mode of levying and collecting the taxes to pay the expenses of maintaining the District, compensating its officers, agents, and employees, and in section 59 sets forth a proviso clause to cover unexpected emergencies arising from excessive flow of water or damage to the works of the District and limits the incurring of a liability for such purposes in the sum of $40,000. The different sections to which we have referred for the raising of money set forth specifically how the money shall be raised either by the levying of an assessment by the board of directors or the submitting of the question of raising money by a special assessment to the voters of the District.

[8] It does not appear that the provisions of these various sections relative to the raising of money and limiting the liabilities which may be placed upon the District by the board of directors were complied with or in any manner attempted to be complied with, either prior or subsequent to the tenth day of July, 1922. As said by the learned trial judge: "There is nothing in the contract of employ-

ment which brings it within the purview of the exception
contained in section 61, which exception relates exclusively
to the incurring of indebtedness before levying the first
assessment." Clearly the contract sued upon, as already
shown, attempted to create a liability against the District
far in excess of the provisions of the act, because nothing had
been done as required by section 39 or section 59, or any
other sections which apply to the raising of money for the
purposes of the District other than by the sale of bonds,
in the levying of assessment or otherwise or at all. In
this particular the opinion of the supreme court in the case
of *Hughson* v. *Crane*, 115 Cal. 413 [47 Pac. 120], quoted by
the trial judge, is also applicable: "The irrigation act is
evidently framed upon the theory, and with the intention
on the part of the legislature, that the affairs of the district
shall be conducted upon a ready-money basis, and not
upon credit, and, to enable the directors to carry out this
purpose, provision is made for levying special assessments
for the payments of salaries, wages, and expenses of man-
agement, etc."

In *Ser-Vis* v. *Victor Valley Irr. Dist.*, 190 Cal. 732 [214
Pac. 223], the sections of the Irrigation Act with which we
are dealing were considered by the supreme court and the
ruling there announced is the same relative to the incurring
of liabilities which we are following here, and which, we
think, prohibits boards of directors from incurring liabilities
such as are presented in this case, without having first
made provision for the payment thereof in the manner pre-
scribed in the Irrigation Act. In *Lincoln & Dawson County
Irr. Dist.* v. *McNeal*, 60 Neb. 613 [83 N. W. 847], the su-
preme court of Nebraska, construing the various sections of
the irrigation act of that state, which, in the particulars now
being considered, is almost an exact copy of the California
act, it was held that the incurring of liability without first
making provision for its payment was inhibited and col-
lection could not be had. It was also held in that case if the
contract was one which the district was authorized to make
at the time it was made, but that the manner of making the
same was irregular and the district had received the bene-
fit thereof, then and in that case, recovery could be had.
In other words, if at the time the power is exercised it may
be lawfully exercised and benefits have been received under

the contract so entered into, the district will not be permitted to defend payment on that ground, but must pay on a *quantum meruit* count the value of the benefits received or services performed. In the case at bar we have a lack of authority to exercise the power at the time it was attempted to be exercised, and not simply a defect in the mode of exercising that power. The authorities are practically uniform in support of the rule that where the want of funds at the time of the execution of the proposed contract renders the same invalid, recovery cannot be had. If the contract is valid at the time•of its execution, the want of funds to pay the claim when presented is immaterial, unless some other statutory inhibition invalidates a judgment made and entered for the plaintiff on such a contract, even though funds are unavailable for present payment thereof. (*City of Santa Cruz* v. *Wykes,* 202 Fed. 357 [120 C. C. A. 485]; *Arthur* v. *Petaluma,* 175 Cal. 215 [165 Pac. 698]; *Chester* v. *Carmichael,* 187 Cal. 287 [201 Pac. 925]; *Higgins* v. *San Diego Water Co.,* 118 Cal. 527 [45 Pac. 824, 50 Pac. 670]; *Buck* v. *City of Eureka,* 119 Cal. 44 [50 Pac. 1065]; *Montague* v. *English,* 119 Cal. 226 [51 Pac. 327].)

[9] Respondent further insists that the memorandum of agreement dated the thirty-first day of July, 1922, is *ultra vires* and void; that the making and entering of such an agreement is entirely outside of and contrary to the provisions of the Wright Irrigation Act. We think that a reading of the memorandum is all that is necessary to answer this contention in the affirmative. Clearly the board of directors of the Madera Irrigation District are only empowered to execute the various provisions of the Irrigation Act for the preservation of the District, for the protection of its properties, and for the distribution of water to the irrigable lands within the boundaries of the District. There is nothing in the Irrigation Act which empowers a board of directors to contract to dispose of its properties, to provide for the dissolution of the district, and the conveyance of its rights and privileges to some other corporation. [10] There is a section in the Irrigation Act empowering a board of directors under certain circumstances to sell property unnecessary for the uses and purposes of the district, but there is nothing in any of the sections which contemplates

the entering into a contract for the dissolution and death of the district. Voluntary dissolution of a district can only be had in accordance with the provisions of the act of the legislature as amended in 1915 (Stats. 1915, p. 859.) Involuntary dissolution must be had in accordance with the act approved May 19, 1919. Again, the memorandum calls for an illegal delegation of power to determine the boundaries of a proposed district, provides for the turning over of the property of the Madera Irrigation District, provides for the management of the new district contrary to the mode prescribed by statute, and in various ways constitutes a virtual surrender on the part of the board of directors of the Madera Irrigation District of the powers and functions which by statute they are expressly authorized and required to perform in a definite and particularized mode.

[11] The wisdom of the agreement has nothing whatever to do with its *ultra vires* character. If the agreement procured is not one authorized by the Irrigation Act, it is illegal, even though there is no taint or color of moral wrong. It is not a question of right or wrong. It is simply a question of legality or illegality. It may be that the differences between the District and Miller & Lux, Incorporated, which the record shows to be owners of several thousands of acres of land situate within the exterior boundaries of the District, can best be settled by the dissolution of the Madera Irrigation District and the formation of a water storage irrigation district, but this does not alter the situation as to the *ultra vires* and unauthorized contract presented in this case. [12] The rule is uniform that boards of directors of irrigation districts have only such powers as are expressly granted or necessarily included in the exercise of the powers granted. (*Stimson* v. *Allesandro Irr. Dist.*, 135 Cal. 389 [67 Pac. 496, 1034]; *Danley* v. *Merced Irr. Dist.*, 66 Cal. App. 97 [226 Pac. 847–854]; *Colburn* v. *Wilson*, 23 Idaho, 337 [130 Pac. 381].) That boards of directors cannot in any such manner abdicate their powers and turn over the properties to other corporations is well established. *Colburn* v. *Wilson, supra*, where it is said: "A contract by the board of directors of such a district, giving to others the management or control of any part of the system, and taking that management and con-

trol out of the hands of the district board, would be *ultra vires* and void.'' (See, also, *Chase* v. *Treasurer, Los Angeles, etc.*, 122 Cal. 540 [55 Pac. 414]; *Egan* v. *San Francisco*, 165 Cal. 576 [Ann. Cas. 1915A, 754, 133 Pac. 294], and for a general discussion of the subject, 2d ed., Thompson on Corporations, vol. 3, sec. 2426 et seq.)

[13] The trial court further found that the services to be performed by the plaintiffs under the contract were not fully performed; that the making of the agreement procured did not constitute a composition or settlement of the differences between Miller & Lux, Incorporated, on the one hand and Madera Irrigation District on the other; that no suits were settled, no pending litigation was terminated. A reading of the instrument shows that at best it is only a proposed method by which a composition or settlement may be had, that, as said by counsel, it is only an armistice and not a treaty of peace, in that it points out a road by which a final settlement may be reached, but it is in no sense a settlement and is not binding upon anybody. For these reasons, among others, the trial court also found that plaintiffs were not entitled to recover on the *quantum meruit* count contained in their complaint.

[14] Appellants present the further point that the order allowing intervention on the part of Miller & Lux, Incorporated, is erroneous, but from the views here expressed, it is clear that, if erroneous, the order of the court has not resulted in a miscarriage of justice, and would not constitute grounds for reversal, as it is covered by the provisions of section 4½ of article VI of the state constitution. It is further contended on the part of the respondent intervener that, notwithstanding the finding of the court that no fraud as a fact was perpetrated upon the intervener in this case, that fraud as a matter of law exists, in that the board of directors occupying the position of a trustee toward the land owners, were entering into an undisclosed agreement, which would, if consummated, fix a charge upon intervener's land as a *cestui que trust* without its knowledge or consent. The appeal is upon the judgment-roll alone, and whether the contention of the respondent is or is not meritorious, does not, from the views which we have heretofore expressed herein, affect the final determination of this case.

For this reason we do not think it necessary to pass upon this contention made by the intervener.

The judgment is affirmed.

Hart, J., and Finch, P. J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 24, 1925.

All the Justices present concurred.